## Butler et al. v. Purtell et al.

*F. J. Scott*, for plaintiffs.

*J. Melvin Kelly*, for defendants.

LITTLE, P. J., August 29, 1944. — On August 31, 1942, the Apolacon Township School Directors passed a resolution to institute condemnation proceedings for the appropriation of a small parcel of real estate, the property of Thomas Creagh et al., near the "Bow Bridge road", as a location for a shelter for the use of children while awaiting transportation to and from school. The school board entered upon the land, after futile efforts to purchase it, and took possession. Upon their petition for the appointment of viewers filed September 9, 1942, viewers were appointed and placed a value of $35 upon the land.

A shelter was duly erected upon the land appropriated by the school board and Patrick Butler, a resi-

dent of Apolacon, filed his bill in equity as of November term, 1942, no. 82, praying for a rule to show cause why the school board should not be enjoined from condemning the land in question. Later his mother, Anna J. Butler, was joined as a plaintiff. Evidence was taken, briefs filed, and all arguments completed June 20, 1944. No requests for findings of fact or law were filed by either litigant. On July 10, 1944, the case was resubmitted to the respective attorneys for further briefs and argument on certain points involved. No additional briefs were filed and no additional argument requested. The case was resubmitted to this court on August 22, 1944.

### Findings of fact

1. The School Directors of Apolacon Township have been furnishing transportation for Patrick Butler's daughter from a point one and one half miles distant from the Butler home to the nearest public school.

2. The school board, through its agent or representatives, made an effort to purchase from Thomas Creagh, and his brothers and sisters, a small plot of ground to furnish a site for a shelter building.

3. The school directors were unable to reach an agreement with the owners.

4. A resolution was passed by the school board to enter and take possession of the lot.

5. The resolution and the vote thereon was reported in the minutes.

6. The school board did take possession of the property.

7. Pursuant to a petition by the school board, viewers were appointed by the court and assessed the damage at $35.

8. A shelter building was placed upon the property condemned.

9. A shelter building was needed at this location.

10. The shelter building in question was safe and suitable for the needs of children awaiting transportation.

### Questions of law involved

1. May a school board condemn land for the purpose of erecting a shelter building thereon?

2. Did the School Board of Apolacon Township comply with statutory requirements in this condemnation proceeding?

### Discussion

The power of eminent domain, being in derogation of private rights, must spring from statutory enaction. Thus, being purely a creature of statute, its exercise must conform in every item to the statutory provisions creating it. In this we agree with plaintiffs. See Palmer Water Co. v. Lehighton Water Supply Co., 280 Pa. 492.

The authority must be strictly construed; what is not granted is not to be exercised: Lance's Appeal, 55 Pa. 16, 26. See also article IV, sec. 58, of the Statutory Construction Act of May 28, 1937, P. L. 1019, requiring a strict construction of the act.

"School districts are creatures of the statutes and only have such powers as are thereby given to them; they are 'corporations of lower grade and less power than a city, have less the characteristics of private corporations and more of a mere agent of the state; they are territorial divisions for the purposes of the school laws, and their officers have no power except by express statutory grant and necessary implication'": Mulligan v. School District, 241 Pa. 204, 207.

A decision of the matter before us then rests upon the language employed by the legislature in clothing the several school boards with the right of eminent domain.

The pertinent sections of the School Code of May 18, 1911, P. L. 309, conferring the power are:

Section 601: "The board of school directors of each district shall provide the necessary grounds and suitable school buildings to accommodate all the children between the ages of six and twenty-one years, in said district, who attend school. Such buildings shall be constructed, furnished, equipped, and maintained in a proper manner as herein provided, suitable provisions being made for the heating, ventilating, and sanitary conditions thereof, so that every pupil in any such building may have proper and healthful accommodations."

Section 602: "In order to comply with the provisions of this act, and subject to the conditions thereof, the board of school directors of each district is hereby vested with the necessary power and authority to acquire, in the name of the district, by purchase, lease, gift, devise, agreement, condemnation, or otherwise, any and all such real estate, either vacant or occupied, as the board of school directors may deem necessary to furnish suitable sites for school buildings and playgrounds for said district, or to enlarge the grounds of any school property held by such district, and to sell, convey, transfer, dispose of, or abandon the same, or any part thereof, as the board of school directors may determine."

Section 604: "The location and amount of any real estate required by any school district for school purposes shall be determined by the board of school directors of such district, by a vote of the majority of all the members of such board: Provided, That no new school building shall hereafter be erected without a proper play-ground being provided therefor."

Section 605: "Whenever the board of school directors of any district cannot agree on the terms of its purchase with the owner or owners of any real estate that said board has selected for school purposes, such board of school directors, after having decided upon the amount and location thereof, may enter upon, take possession of, and occupy such land as it may have

selected for school purposes, and designate and mark the boundary lines thereof, and thereafter may use the same for school purposes according to the provisions of this act."

Section 608: "The board of school directors of any school district may enter upon and acquire any land in said district, either vacant or occupied, that it may require for school purposes, in compliance with the provisions of this act, except the following: Any burial-ground, or any land belonging to any incorporated institution of learning, incorporated hospital association, or unincorporated church, incorporated or unincorporated religious association, which land is actually used or held for the purpose for which such burial-ground, institution of learning, hospital, association, church, or religious association was established."

For that portion of the statute referring to shelter stations we go to section 1408 of the School Code of 1911, supra, which provides:

"Where, by the terms of this act, any distance is specified between the residence of any pupil and any public school to be attended by him, or any transportation is provided for within or beyond any particular distance, in computing such distance no allowance shall be made for the distance that the dwelling-house of the pupil is situated off the public highway. All such distances shall be computed by the nearest public highway: Provided, That the free transportation of pupils, as required or authorized by this act, may be furnished by using electric railways, school conveyances, or other public transportation, when the total distance which any pupil must travel between his residence and the school, in addition to such transportation, does not exceed one and one-half miles, and when stations or other proper shelters are provided for the use of such pupils where needed."

Thus, the duty of erecting shelters or waiting stations where needed is imposed upon school directors where transportation is supplied,

Plaintiffs urge that a shelter is not a school building, that it is a school district building and does not come within the provisions of the School Code of 1911 which confer upon a school district the right of eminent domain only for the purpose of acquiring sites for school buildings and playgrounds. In support of this contention they cite section 615 of the School Code, which requires submission of plans for school buildings to the State Council of Education, as indicative of the legislative intent that when it referred to school buildings in connection with the power to acquire real estate it was restricting the right to the land necessary as sites for buildings in which classes were to be conducted. They likewise contend that section 602 of the School Code of 1911, as amended by the Act of April 27, 1925, P. L. 348, sec. 1, provides for condemnation of land only as sites for school or classroom buildings and playgrounds; that where the legislature granted the right to acquire lands for school purposes, the only purpose intended was the acquisition of sites for school class buildings and playgrounds.

In construing a provision of a statute, the language of the section must not be interpreted in a forced or strained sense, but in the sense in which it is commonly and ordinarily used, and in the sense in which it is used in other sections of the act: Bell Telephone Company of Penna. v. Public Service Commission, 119 Pa. Superior Ct. 292, 295. Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage: Statutory Construction Act of May 28, 1937, P. L. 1019, art. III, sec. 33; and it is to be presumed that the legislature does not intend a result that is absurd, impossible of execution, or unreasonable: Commonwealth v. Repplier Coal Co., 348 Pa. 372.

When we examine section 3 of the Act of July 1, 1937, P. L. 2583, amending section 4 of the Act of May 13, 1925, P. L. 628, which in turn amended

but did not change materially the general provisions of section 1408 of the School Code of 1911, supra, requiring school boards to erect waiting stations or shelter buildings when transportation is furnished in compliance with the statute, we find that if we accept plaintiffs' interpretation of the preceding sections of the code of 1911 we are forced to conclude that the legislature has imposed upon school directors certain duties which, in the face of opposition, they could never carry out.

Sections 601 to 608, inclusive, must be read together. Section 602, which provides the power of condemnation, qualifies and limits all the other sections which follow it. The succeeding sections simply explain or form a method for carrying out the power given in section 602.

Section 601 provides that school directors shall supply the necessary grounds and suitable school buildings to accommodate all the children between the ages of six and twenty-one years. It further provides that such buildings shall have proper and healthful accommodations. This section, however, does not define every type of school building directors may or must provide.

Section 602 vests the necessary power to acquire such real estate as the school directors deem necessary in order to comply with the provisions of this act and subject to the conditions thereof to furnish sites for school buildings and playgrounds or to enlarge grounds held by said district, etc.

Section 604 provides that the school directors shall determine by vote of the majority of all the members of such board the location and amount of any real estate required for school purposes and provides that no new school building shall thereafter be erected without a proper playground being provided therefor.

Section 605 provides for the taking of any real estate selected for school purposes without agreement with the owner.

Section 608 again supplies the power to take possession of and to occupy land selected for school purposes in compliance with the provisions of the act, with certain defined exceptions.

Returning now to plaintiffs' contention that the only buildings considered by the legislature in these sections were buildings used for instruction, it becomes our duty to determine what is the legal meaning of the term "school buildings" and in what sense it was used by the legislature in this code.

Obviously no classes are held in shelters or waiting stations. Therefore, viewing the definition in its narrowest sense, that of a building used for the purpose of instruction, it would not include a shelter station. But there is nothing in the act to require us to adopt a narrow or too strict definition. A shelter building while not attached to a school instruction building is an important part of the plant, is owned in the same manner, is necessary to the success of the school curricula, and vital to the health of children who must be furnished transportation. It is one of the necessary buildings the directors are required to supply by section 601. We think the term "school buildings" covers not only buildings used for instruction, but all buildings vital to the district as a part of the plant and necessary to carry out the provisions of the School Code. In rural districts where the one-room school is still in operation, it is necessary to construct outhouses separate from the building; they must be constructed according to plans provided by the State Department of Education. We believe that for all the purposes of the act they, too, are school buildings. Oftentimes it is necessary to construct woodsheds, coal houses, storage buildings, garages, etc.; they likewise as a part of the school plant are school buildings. There is no valid reason to adopt a narrow definition of the term "school buildings" in order to defeat the very purpose of the

act. While this act requires strict construction, it is to be remembered that strict construction does not require that every plain, useful, and manifest purpose of the act be construed out of it. It means that nothing may be taken by intendment.

Section 602 gives school directors power to condemn land as sites for school buildings and playgrounds or to enlarge lands already held, etc. If a shelter is a school building, which we think it is, school directors have power to condemn land as a site for one where it is needed under the terms of the statute. Plaintiffs suggest that the language employed in this section plainly shows that the legislature did not intend to include shelters because it coupled school buildings with playgrounds. This does not impress us as a necessary construction. Here, we believe, the legislature intended to give the school directors an added power, that is the power to condemn land as sites for playgrounds where necessary for school purposes separate and apart if practicable from or even some distance away from any school buildings or to furnish a site for a playground as a complement to a building previously erected or to enlarge one already erected. The two purposes of condemnation or rather objects of the power are not necessarily connected as one. The word "and" between school buildings and playgrounds is a connective particle used in the sense of addition, adding one object to another. It is therefore a fair and rational construction of this section, when considered with the remaining sections of the act, to read it in this sense—to acquire—by condemnation—real estate—to furnish sites for school buildings and to furnish sites for playgrounds or to enlarge, etc. We construe this section as supplying the power of condemnation of land for three purposes: (1) As sites for school buildings; (2) as sites for playgrounds; and (3) as sites for enlarging lands already held.

Plaintiffs urge that section 604 shows that the legislature was treating of school instruction buildings because this section contains the following provision:

"Provided, That no new school building shall hereafter be erected without a proper playground being provided therefor."

Cursory examination of this proviso might lead to the conclusion that it restricted the power of eminent domain to those buildings requiring playgrounds, but we are of the opinion that the legislature never intended such a limited construction. The word "proper" as used in this provision means "fit", "suitable", "necessary", or "required by the act". This proviso may reasonably be limited and restricted to those buildings which must be supplied with playgrounds and thus carry out the provisions of the complete act without offending against a strict construction of it. We are of the opinion that the legislature did not intend here to deny the power to condemn land for necessary school buildings without playground requirements but rather to make certain that no new school building requiring one should thereafter be constructed without it. A playground would be useless as far as a shelter building is concerned, therefore, no playground would be a proper one. The erection of a necessary school building without a playground where none is reasonably required or necessary does not violate this provision. Section 605, therefore, does not restrict the grant of the power of eminent domain supplied in section 602 when such necessary school buildings are required.

Plaintiffs contend that the fact that the legislature in this act in section 615 requires submission of plans for school buildings, requires proper lighting, ventilation, heating, etc., and that this must be assured before buildings may be constructed shows that the legislature was considering only classroom buildings. We do not find in this argument a basis for excluding the gen-

eral and commonly-used understanding of what is meant by the term "school buildings". Shelters, too, must be constructed along lines approved by the State department, must be properly ventilated, and properly lighted. Heat is not always required or necessary. The very shelter building in question was construed from plans found to be satisfactory to the department. We find no sound reason here to exclude a shelter building from the provisions of section 602. In sections 604, 605, and 608 the legislature, in defining the manner in which the power of condemnation granted in section 602 should be carried out, refers continually to land necessary "for school purposes", which strengthens defendants' contention that school buildings are buildings necessary for school purposes. Land selected as a site for a shelter building is land used for school purposes.

It is our opinion that, for the purpose of this code and for the purpose of carrying out the clear intent of the legislature, when the term "school buildings" is used in the sections under consideration it includes all the buildings necessary to the school plant to comply with the provisions of the act.

We have searched unavailingly for Pennsylvania decisions defining the status of school shelter buildings but it has been decided in other jurisdictions. In McCullough v. Swifton Consolidated School District, 202 Ark. 1074, 155 S. W. (2d) 353, it was held that, where a deed to a school district provided that property should be used for school purposes only and should revert to the grantor, should the school district at any time abandon the property, and thereafter the school district was consolidated with another which began to tear down a school building located on the land for the purpose of salvaging the material, part of which was to be used for the erection of a waiting station at that place for school children who rode a school bus to the consolidated school, the land was not abandoned and did not revert

to the grantor, notwithstanding that no school was conducted there, since it was still used for school purposes.

When the legislature said in section 602, which gives the power of condemnation of land as sites for school buildings and playgrounds, and in section 605 that a school board may select, take, and occupy land and thereafter use the same for school purposes according to the provisions of the act, and later in section 608 gave them power to take and use land for school purposes, it does not constitute a departure from a strict interpretation of the power of eminent domain conferred to say that the legislature was then contemplating every and all provisions of the act and therefore had in mind the possible necessity of condemnation of land for school purposes in order to provide a shelter for pupils awaiting the transportation to be supplied under section 1408. Intending to require the erection of shelters, when furnishing the power to condemn land which school directors deemed necessary for school purposes, the legislature intended to supply authority to secure land upon which to erect them. This construction gives effect to the whole statute and every law must be construed if possible to give effect to all of its provisions: Commonwealth ex rel. Schnader v. King, 312 Pa. 412; Commonwealth v. Hubbs (No. 1), 137 Pa. Superior Ct. 229, 239; Commonwealth v. Daly et al., 147 Pa. Superior Ct. 545, 551. In order to do this we must compare the doubtful words with the context of the act, balance the doubtful sections against the context of the act as a whole, and adopt a broad view of the act to the end that we may effectuate and carry out what the legislature has created as a workable code.

"It is also a well-established principle that a determination of the true meaning of a statute requires a broad view of the act and a comparison of the doubtful words with the context of the law. *New York Life Insurance Co. v. Guaranty Corporation*, 321 Pa.

359, 184 A. 31. In the Guaranty Corporation case the Supreme Court (at pp. 362-3) referred to Endlich on the Interpretation of Statutes, p. 35, §27, as follows: 'The literal construction then, has in general, but a prima facie preference. To arrive at the real meaning, it is always necessary to take a broad general view of the act, so as to get an exact conception of its aim, scope and object. . . . The true meaning is to be found, not merely from the words of the act, but from the cause and necessity of its being made, from a comparison of its several parts and from extraneous circumstances; or by an examination of, and comparison of the doubtful words with, the context of the law, considering its reason and spirit, and the inducing cause of its enactment' ": Keating v. White et al., 141 Pa. Superior Ct. 495, 504.

The purpose of the act is to create a code to guarantee to all children between the ages of six and twenty-one years educational advantages.

This code, under all the increasing problems continually arising in a State pledged to afford all possible educational advancement to its youth, should receive a fair and reasonable interpretation in all courts of justice. It must not be hampered by pronouncements circumscribing its plain language with technical interpretations which defeat the obvious intent of the legislature. We are of the opinion that a strict interpretation of the sections involved gives this school board the right to condemn the property in question and does not offend the provisions of any other section in the act. The legislature did not impose a duty upon this school board which it could not comply with. We therefore hold that a school board may condemn land for the purpose of erecting a shelter thereon where needed to comply with the terms of the act.

Plaintiffs further contend that this "taking" is not for a public use in that at the present time only one child is using the shelter. In our opinion this does not

render the entry and taking of possession an exercise of the right for private use. In Pennsylvania judicial interpretation of the term "public use" has not been circumscribed by mere legalistic formulas and philological standards. As governmental activities increase with growing complexity and integration of society, the concept of "public use" naturally expands in proportion. It is not essential that the entire community or even a considerable portion of it should enjoy or participate in an improvement in order to make its use a public one—an enterprise does not lose the character of a public use because that use may be limited by circumstances to a comparatively small part of the public. See Dornan v. Philadelphia Housing Authority et al., 331 Pa. 209, 221.

The school district anticipated the presence of other families in this particular locality from which children of school age would come and use this shelter. As a health and safety measure, the directors were legally bound to supply it. The fact that at the present time only one child is using it does not detract from its status as a building for use of the public.

Did the school board in this case comply with the terms of the statute? This we answer in the affirmative. The evidence discloses that defendants first sought to acquire by purchase. When unable to do so, a meeting was properly called, a vote taken, the resolution to condemn carried, and the vote recorded. We are not convinced that the school board was motivated by other consideration than public interest. The shelter erected was similar to that approved by the proper authorities for the purpose.

There was no affirmative proof that the school board failed to attempt a settlement before taking possession and there is not present in the record the slightest evidence of fraud. On the other hand the record discloses positive testimony of attempts to purchase before the resolution was passed and the futility thereof.

"Resolutions effecting condemnation could not be passed until there had. been a failure to agree. The resolutions presuppose such inability to agree, and the regularity of the proceedings will not be inquired into when the condemnation resolutions are, as here, placed on the minutes, unless there is an affirmative showing that the minutes had no basis in fact, or were fraudulent. . . . The condemnation resolutions of February 2, 1925, and January 27, 1927, must be considered to have followed unsuccessful negotiations with the owners": Jury et al. v. Wiest et al., 326 Pa. 554, 558; and there being no proof of fraud, or of any other fact establishing any motive on the part of the school board other than the desire to perform a public service and condemn this land for public use, we have no reason to investigate this accusation by plaintiffs.

"The question whether the properties were needed for school purposes or fitted for such use is not for us; it is an administrative matter, and in absence of fraud the action of the school directors condemning the properties is conclusive on us": Jury et al. v. Wiest et al., supra. See also Harris v. Philadelphia Board of Education et al., 22 D. & C. 15, and Zelesnick v. Spring Township School District, 12 D. & C. 345.

### Conclusions of law

1. A school board may condemn land as a site for the erection of a shelter where needed under the provisions of the School Code.

2. The School Directors of Apolacon Township complied with the requirements of the statute in this case.

3. Plaintiffs are not entitled to equitable relief against defendants under all the circumstances of this case.

### Decree nisi

And now, to wit, August 29, 1944, upon consideration of the foregoing case, it is ordered, adjudged, and

decreed that the bill be dismissed, costs to be paid by plaintiffs. Unless exceptions are filed within 10 days after notice of entry thereof, this decree nisi shall be entered as the final decree.